UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KIMBERLY A. CHIODO, | ) | 1:16CV1482 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD NUGENT |
| | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | REPORT AND RECOMMENDATION |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Kimberly A. Chiodo (hereinafter, "Chiodo" or "claimant") challenges the final

decision of Defendant Commissioner of Social Security (hereinafter, "Commissioner"), denying

her application for  Disability Insurance Benefits ("DIB") under Title II of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act").  This Court has jurisdiction pursuant to 42

U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to

an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the

reasons set forth below, the Magistrate Judge recommends that the Commissioner's final

decision be AFFIRMED.

## I.  PROCEDURAL HISTORY

On November 19, 2014, Chiodo applied for DIB alleging a disability onset date of June

1, 2013.  (R. 9, PageID #: 63, 65, 203-206, 265.)  The application was denied initially and upon

reconsideration, and Chiodo requested a hearing before an Administrative Law Judge ("ALJ").

(*Id.*, at PageID #: 115-130, 131-145, 166-167.)  Chiodo participated in the hearing, was represented by counsel, and testified.  (*Id.*, at PageID #: 83, 85.)  A vocational expert ("VE") also participated and testified.  (*Id.*, at PageID #: 86, 108-112.)  On December 2, 2014, the ALJ concluded Chiodo was not disabled.  (*Id.*, at PageID #: 63, 78.)  The Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (*Id.*, at PageID #: 57, 47-49.)  On June 15, 2016, Chiodo filed a complaint challenging the Commissioner's final decision.  (R.1).  The parties have completed briefing in this case.  Chiodo asserts two primary assignments of error alleging: (1) the ALJ's improperly evaluated the mental health evidence of record and (2) the ALJ's decision should be reversed because it violated Social Security Ruling 06-3P.  (R. 10.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Chiodo was born on June 13, 1965, and was 47 years old on her alleged disability onset date.  (R. 9, PageID #: 76, 203.)  Chiodo was considered a younger person for Social Security purposes.  *See* 20 C.F.R. § 404.1563(c).  She has completed twelfth grade, is able to communicate in English, and has past relevant work as a Teller and an Administrative Clerk.  (R. 9, PageID #: 76, 109, 233, 235-236.)

### III.  RELEVANT MEDICAL EVIDENCE[1]

### A.  Treatment Records

A short summary of relevant medical history follows here.[2]  Chiodo applied for Disability Insurance Benefits on November 19, 2014.  (R. 9, PageID #: 63, 203-206.)  She identified the physical or mental conditions that limit her ability to work as:  "DDD in back; Pinched nerve in (R) leg; Anxiety; Has had 2 back surgeries; Has a Spinal Stimulator; Injections no longer helping."  (*Id*. at 234.)  Chiodo does not dispute the ALJ's decision and RFC regarding her physical conditions.  She, however, challenges the ALJ's assessment of her mental health impairments.

Chiodo refers the court to the following relevant evidence.  (R. 10, PageID #: 781-782.) Nurse-Practitioner Karen Woodard[3], of the VA Behavioral Health Department, has been treating Chiodo since February 2007.  (R. 9, PageID #: 647.)  Woodard's treatment notes indicate consistent depressed and anxious moods.  (R. 10, PageID #: 781, citing R. 9, PageID #: 371, 378, 397, 415, 423, 503, 533, 593.)

During a July 12, 2013, visit with Woodard, Chiodo reported that she had "started a claim" for her anxiety and for her back, and that she had quit work on May 1.  (R. 9, PageID #: 597.)  Chiodo reported "that she was unable to tolerate the stress of the occupational

---

[1]  The following is merely a summary of the medical evidence relevant to the undersigned's decision.  It is not intended to fully reflect all of the evidence the undersigned took into consideration.

[2] Disputed issues will be discussed as they arise in Chiodo's brief alleging errors by the ALJ.

[3]  The ALJ's decision and Plaintiff's brief spells her name as "Woodward," *see, e.g.*, R. 9, PageID #: 69, but the proper spelling is Woodard.  *See, e.g.*, R. 9, PageID #: 647, 654.

environment mentally, emotionally, and physically, and decided that [she] had to quit." *Id*. She

said that her anxiety and depression led to a decreased interest in getting out of the house, and to

self-isolation. *Id*. She stated that anxiety and depression also caused irritability and impatience

in dealing with the public and coworkers. *Id*. Woodard noted that Chiodo continued to have

problems with "some PTSD type symptoms including anger, feeling helpless, tolerating certain

noises . . . loud noises . . . hypervigilance, exaggerated startle, intrusive thoughts, and [she]

avoids picking things up from the yard because of fear about IEDs going off." (*Id*. at 597.)

Woodard reviewed coping strategies with Chiodo, who reported that her stress was under better

control since leaving her job, but she no longer felt capable of working. She rated her depression

at 8 on a scale of 1 (best) to 10 (worst), and her anxiety at 7. (*Id*.) She rated her quality of life at

8 on that scale. (*Id*. At 598.)

During a November 7, 2014, visit with Woodard, Chiodo reported an episode of

depression the previous day, and said it was becoming more difficult to deal with chronic pain

issues, and financial stressors. Chiodo said she had increased depression and anxiety, and felt

easily overwhelmed at times. Chiodo reported that noise of any type was triggering anxiety. She

rated her depression at 6 on a scale of 1 (best) to 10 (worst). (R. 9, PageID #: 368.) Questioned

about any diminished ability to think or concentrate, Chiodo responded that it varied due to

anxiety and worry. At the same time, she denied having excessive anxiety and worry, and

denied finding it difficult to control the worry. Chiodo reported her sleep was "pretty good," and

denied having any panic episodes. (*Id*. at 369.) She rated her quality of life at 8 on a scale of 1

(best) to 10 (worst). (*Id*. at 370.)

<u>B. Medical Opinions Concerning Claimant's Functional Limitations</u>

On March 10, 2015, Nurse-Practitioner Woodard completed a "Mental Impairment Questionnaire (RFC & Listings)" concerning Chiodo. (R. 9, PageID #: 647-654.) Woodard indicated she had been treating Chiodo since 2007, with medicinal management and psychotherapy, resulting in some stabilization of symptoms. She diagnosed her with anxiety, depression, and chronic pain. Woodard noted that the claimant has sleep disturbance, hypervigilance, and difficulty tolerating groups, crowds, and loud noises. (*Id*. at 647.) Woodard checked off the following symptoms on the form: decreased energy, mood disturbance, difficulty thinking or concentrating, apprehensive expectation, motor tension, vigilance and scanning, easy distractability, and sleep disturbance. (*Id*. at 648.)

On the section of the assessment form concerning the claimant's ability to do work-related activities, Woodard marked that Chiodo was "unable to meet competitive standards" in her mental ability to perform at a consistent pace without an unreasonable number and length of rest periods. She was "seriously limited" in her ability to maintain attention for a two-hour segment, to deal with normal work stress, to understand, remember, and carry out detailed instructions, to set realistic goals and make independent plans, and to deal with the stress of semiskilled and skilled work. (R. 9, PageID #: 651-652.) In ability to complete a normal workday and work week without interruptions from her psychological symptoms, Woodard marked between "seriously limited" and "unable to meet competitive standards." (*Id*. at 651.)

On the other hand, Woodard marked Chiodo was "unlimited or very good" in her abilities to carry out very short and simple instructions, to maintain regular attendance and punctuality, to sustain an ordinary routine with special supervision, to ask simple questions or request assistance, and to be aware of normal hazards. (R. 9, PageID #: 651.) Chiodo's ability to

interact appropriately with the general public was assessed as limited but satisfactory, while she was unlimited in maintaining socially appropriate behavior. (*Id*. at 652.) As to functional limitations, Woodard found Chiodo had moderate difficulties in maintaining concentration, persistence or pace, but no (or mild) limitations in such areas as activities of daily living, and maintaining social functioning. (*Id*. at 653.) Woodard anticipated that Chiodo would be absent from work, on average, about four days per month. Woodard noted that she would have difficulty working at a regular job on a sustained basis due to "chronic pain, difficulty tolerating loud noises & crowds, [and] hypervigilance." (*Id*.)

The ALJ's decision stated that a nurse practitioner's opinion is evaluated differently from those of an acceptable medical source, such as a treating physician. (R. 9, PageID #: 76.). The ALJ indicated that a nurse practitioner's opinion is evaluated on issues such as the consistency of claimant's allegations and longitudinal impairment-related functional effects in light of other evidence in the record. (*Id*., citing SSR 06-3p.) The ALJ gave "little weight" to Woodard's opinion, "as it is internally inconsistent and not consistent with the claimant's own reports to Ms. Woodard regarding her level of functioning." (*Id*. at 76.)

On May 20, 2015, Chiodo was examined by Richard C. Halas, M.A., a clinical psychologist. (R. 9, PageID #: 75, 689-694.) Halas noted that Chiodo was diagnosed with major depression, generalized anxiety disorder, and post-traumatic stress disorder. (*Id*. at 693.) The ALJ summarized Halas' findings as follows:

> [Chiodo] had little to no difficulty in understanding, remembering and carrying our tot instructions. She appeared to have little to no difficulty…maintaining attention and concentration, and maintaining persistence and pace to perform simple tasks and to perform multi-step tasks. The claimant appeared to have severe problems in her abilities and limitations in responding appropriately to supervision and coworkers in a work setting. She had severe problems in responding appropriately to work pressures in a work setting.

([R. 9](#), PageID #: 75; *see also id.* a*t* 694.). (internal citations omitted.)  In addition, Halas determined that her low tolerance for stress would be limiting in a work setting, and her symptoms of PTSD and anxiety were likely to increase under the pressures of competitive employment.  (*Id*. at 694.)  The ALJ gave "great weight" to this opinion, "as it was generally consistent with his examination findings and the psychological evidence as a whole." (*Id*. at 75.)

On May 29, 2015, Leslie Rudy, Ph.D., a state psychological consultant opined that Chiodo can maintain attention, make simple decisions, and adequately adhere to a schedule, but she was depressed and anxious.  ([R. 9](#), PageID #: 139-140.)  Dr. Rudy indicated that her condition restricted her capacity for detailed or complex tasks, but she can comprehend, remember, and carry out simple, and occasionally complex, instructions.  *Id*.  Dr. Rudy found that Chiodo is susceptible to misinterpreting personal nuance, yet she can relate adequately on a superficial basis in an environment that entails infrequent public contact, minimal interaction with coworkers, and no "over-the-shoulder" supervisory scrutiny.  (*Id*. at 141.)  Chiodo's symptoms would exacerbate in the face of perceived stressors, "yet she can adapt to a setting in which duties are routine and predictable.  Changes should be well-explained and introduced slowly."  (*Id*.)  Dr. Rudy stated that Chiodo's treatment records showed her symptoms waxed and waned despite intervention, although she does experience periods of improvement and relief.  Concentration and pace are variable on a day-to-day basis.  (*Id*.)  Social skills are intact, but she struggles with hypervigilance and an easy startle response.  In summary, Dr. Rudy asserted that while Chiodo's condition does impose restrictions, she retains significant functional capacity.  (*Id*. at 141.)

The ALJ also gave "great weight" to Dr. Rudy's opinion, "as it was generally consistent with Mr. Halas' examination findings and the psychological evidence as a whole." (R. 9, PageID #: 75.)

## IV.  TESTIMONY OF VOCATIONAL EXPERT

The vocational expert attended the hearing and testified that Chiodo had past relevant work as a teller, which was performed at the light level of exertion, and an administrative clerk, which was performed at the sedentary level. (R. 9, PageID #: 109.)  The ALJ posed a hypothetical question concerning an individual with Chiodo's work experience, limited to light level.  (*Id.*)  The individual can frequently push or pull with her right arm, can perform simple tasks in a setting with routine and predictable changes that are explained and introduced slowly. The person can perform goal-oriented work, but cannot work at a production rate pace.  The individual can occasionally interact with supervisors and coworkers, if that interaction is limited to speaking and signaling as it is defined in the SCO [Selected Characteristics of Occupations], but cannot interact with the public.  The question posed was whether such a hypothetical person could perform any of the claimant's past work.  (*Id*. at 109-110.)

The vocational expert answered "no," that the past work would not be considered simple, and also the teller position would require work with the public.  (R. 9, PageID #: 110.)

The ALJ next asked whether there were other jobs that such a person could perform.  The VE responded that there would be, and identified several representative occupations.  First, a file clerk, DOT 206.387-034, light and semi-skilled with SVP of 3.  The VE testified that there would be an estimated 204,700 such jobs in the national economy.  Another job would be routine office clerk, DOT 209.562-010, also light and semi-skilled with SVP of 3.  The testimony was

that there would be 2,800,000 jobs in the national economy.  (R. 9, PageID #: 110.) A third job

would be mail clerk in a non-postal setting, DOT 209.687-026, which is light and unskilled, SVP

2.  The VE estimated 68,000 jobs in the national economy.  (*Id*. at 110-111.)

The ALJ then modified the previous hypothetical to include an individual who would be

off-task twenty percent of the time.  The ALJ asked whether such a person could perform the

claimant's past work, or any other work in the economy.  The VE responded that a consistent

twenty percent off-task "is likely to result in poor performance and possibly elimination of

employment."  (R. 9, PageID #: 111.)

The ALJ then posed another hypothetical, asking the vocational expert to consider

someone who might be absent twice monthly on an ongoing basis.  The ALJ asked whether such

a person could perform the claimant's past work, or any other work in the economy.  The

vocational expert responded in the negative, stating that two absences per month generally

constitutes excessive absenteeism.  (R. 9, PageID #: 111-112.)


## V.  ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law in his January 14,

2016, decision:

> 1.  The claimant meets the insured status requirements of the Social Security Act
> through September 30, 2018.
>
> 2. The claimant has not engaged in substantial gainful activity since June 1, 2013,
> the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3.  The claimant has the following severe impairments:  status post right shoulder
> cuff repair, post-laminectomy syndrome, mild degenerative disc disease,
> generalized anxiety disorder, major depression and posttraumatic stress disorder.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.  After careful consideration of the entire record, the undersigned [ALJ] finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she could frequently push or pull with the right upper extremity; can perform simple tasks in a setting with routine and predictable changes that are explained and introduced slowly; can perform goal-oriented work but cannot work at a production rate pace; can occasionally interact with supervisors and coworkers if that interaction is limited to speaking and signaling as it is defined in the SCO.  She cannot interact with the public.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on June 13, 1965 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR  Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2013, through the date of this decision (20 CFR 404.1520(g)).

(R. 9, PageID #: 65-66, 68, 76-78.)

# VI.  DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  20 C.F.R. § 404.1505(a).  Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination regarding disability.  *See* 20 C.F.R. § 404.1520(a); *Heston v. Comm'r of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001).  The Sixth Circuit has outlined the five steps as follows:

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability.  20 C.F.R. § 404.1520(a)(4)(i). Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment.  *Id*. § 404.1520(a)(4)(ii).  Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled.  *Id*. § 404.1520(a)(4)(iii). Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform his past relevant work, in which case the claimant is not disabled.  *Id*. § 404.1520(a)(4)(iv).  Fifth, the ALJ determines whether, based on the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.  *Id*. § 404.1520(a)(4)(v).

> The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

*Wilson v. Comm'r of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004).

## VII.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether the ALJ applied the correct legal standards, and whether the findings of the ALJ are supported by substantial evidence.  *Blakley v. Comm'r of Social Security*, 581 F.3d 399, 405 (6th Cir. 2009)*; Richardson v. Perales*, 402 U.S. 389, 401 (1971)*.*  "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed.  *Wright*, 321 F.3d at 614; *Kirk*, 667 F.2d at 535.

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion.  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).  This court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *Wright*, 321 F.3d at 614; *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  The court, however, may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

VIII.  ANALYSIS

Chiodo raises the following issues for review:

1.  The ALJ's decision improperly evaluated the mental health evidence of record, and as a result the Residual Functional Capacity is unsupported by substantial evidence.

      A.  The ALJ failed to incorporate all of the relevant limitations opined by the state agency paper reviewing psychologists.

      B.  The ALJ failed to incorporate all of the relevant limitations opined by the consultative examiner Dr. Halas[4].

2.  The ALJ's decision should be reversed because the ALJ violated Social Security Ruling 06-3P.

([R. 10](#).)

## A.  Mental Health Evidence: Agency Psychologists

Chiodo asserts that the ALJ improperly evaluated the mental health evidence, and thus the RFC is unsupported by substantial evidence.  First, she argues that the ALJ failed to incorporate all of the relevant limitations opined by the state agency reviewing psychologists.  Chiodo claims that the agency psychologists provided functional limitations that contradicted the ALJ's residual functional capacity finding, and the ALJ did not articulate his reasons for rejecting those limitations.  ([R. 10](#), PageID #: 785-787.)

Social Security Ruling 96–6p requires an ALJ to consider opinions given by state agency medical experts when considering disability claims.  ALJs are not automatically bound by such medical opinions, but they "may not ignore [them] and must explain the weight given to the opinions in their decisions."  *Edwards ex rel. L.T. v. Colvin*,  No. 12-C-7639, 2013 WL 3934228,

---

[4]  Richard C. Halas, M.A., is not a psychiatrist or a physician, but rather is a clinical psychologist.  The title "Doctor" is inappropriate.  ([R. 9](#), PageID #: 689.)

at *4 (N.D. Ill. July 30, 2013) (quoting SSR 96-6p); *see also Johnson v. Astrue*, No. 1:09CV2959, 2010 WL 5559542, at *5 (N.D. Ohio Dec. 3, 2010) (same). "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p. SSR 96-6p also provides that: "In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."

### 1. Interaction with coworkers

Chiodo notes that the ALJ accorded great weight to the agency reviewing psychologists and the consultative examiner. The ALJ found their opinions to be consistent with the evidence of record. (R. 10, PageID #: 784, citing R. 9, PageID #: 74-75.) Chiodo, however, claims there is an inconsistency between the state agency opinion limiting her to "minimal interaction with coworkers," (R. 9, PageID #: 141) and the RFC that allows for occasional interaction with coworkers (R. 9, PageID #: 68). (R. 10, PageID #: 785.) Chiodo maintains that the ALJ "arbitrarily and without explanation" altered the state agency psychologist's limitations. (*Id*. at 786.)

The Commissioner responds that the ALJ's residual functional capacity assessment was consistent with the opinions of the state agency psychologists. (R. 13, PageID #: 811.) The Commissioner asserts that the substantial evidence standard is the proper legal standard for the court to apply; and it is whether a reasonable mind could accept the ALJ's finding, not whether an alternative interpretation is plausible. (*Id*. at 811-812.)

Although the state agency psychologists found that Chiodo was susceptible to misinterpreting interpersonal nuance, the psychologists concluded that she could "relate

14

adequately on a superficial basis in an environment that entails infrequent public contact, minimal interaction with coworkers, and no over-the-shoulder supervisor scrutiny."  ([R. 9](#), PageID #: 126, 141.)  The Commissioner contends that the ALJ provided further limitations than the agency psychologists, in terms of general contact with the public, as the ALJ's RFC excludes all such contact.  ([R. 13](#), PageID #: 812, citing [R. 9](#), PageID #: 68.)

The Commissioner also argues that the ALJ's finding concerning interaction with coworkers was reasonable, insofar as the ALJ merely translated the undefined term "minimal" into a vocationally-defined term ("occasional").  The Commissioner notes that "the ALJ not only limited the frequency of social contact to occasional, but also significantly limited the nature of that interaction to speaking/signaling only."  ([R. 13](#), PageID #: 813.)  In addition, the Commissioner points to the psychologists' statement that "social skills are generally intact," despite her hypervigilance and startle response "in some situations."  Although Chiodo's condition imposes some restrictions, the psychologists stated "she retains significant functional capacity."  (*Id*. at 813; [R. 9](#), PageID #: 126, 141.)  The psychologists did not did endorse any functions as markedly limited, or that she had a marked limitation in social functioning overall. (*Id*. at 813, citing [R. 9](#), PageID #: 122, 136 ("moderate" difficulty in social functioning).)  The Commissioner further asserts that Chiodo's argument—that the psychologists' opinions should be interpreted to mean she cannot usefully sustain the activity of being around coworkers or supervisors—is not consistent with the agency psychologists' opinions overall.  (*Id*. at 814.)

The ALJ's decision relied upon Chiodo's testimony at the hearing that she chaired a committee at her church, where she organized ushers, and dressed the acolytes.  ([R. 9](#), PageID #: 69, citing PageID #: 92.)  She had reported to Woodard that she participated in military reunions ([R. 9](#), PageID #: 69, citing PageID #: 720) and World War II re-enactments ([R. 9](#), PageID #: 69,

citing PageID #: 561).  This was cited as evidence relied on, in part, for the ALJ's determination that Chiodo's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible.  Viewing the evidence in the record cited by the ALJ, *Walker*, 884 F.2d at 245, there is substantial evidence of interpersonal interaction that would support a finding that Chiodo is capable of more than "minimal interaction with coworkers." The ALJ is not bound by the opinions of the state agency psychologists.  *Johnson*, 2010 WL 5559542, at *5.

Reviewing the parties' arguments and the evidence of record on this issue, the court finds the RFC that allows for occasional interaction with coworkers is supported by substantial evidence.  If substantial evidence supports the ALJ's finding, it must be affirmed, even if substantial evidence might support an opposite conclusion.  *Bass*, 499 F.3d at 509; *Wright*, 321 F.3d at 614.

## 2.  Perceived Stressors

Chiodo next argues that the ALJ erred by failing to account for a limitation expressed in the state agency psychologists' opinions.  (R. 10, PageID #: 786.)  Chiodo argues that, although the ALJ adopted the psychologists' opinion almost verbatim, "the ALJ completely omitted the part about Ms. Chiodo's symptoms being exacerbated in the face of perceived stressors."  (*Id*.) In turn, Chiodo alleges, "[t]here is no accommodation for the times that Ms. Chiodo's mental health symptoms will be exacerbated because of her subjectively perceived stressors."  (*Id*.)  The pertinent opinion states that Chiodo's symptoms would be "exacerbate[d] in the face of perceived stressors, yet she can adapt to a setting in which duties are routine and predictable. Changes should be well-explained and introduced slowly."  (*Id.*, citing R. 9, PageID #: 126, 141.).  Chiodo asserts that there is no explanation for why "this expressly opined limitation was

completely omitted" from the RFC, and she claims that the agency psychologists "have opined a specific functional limitation that was completely disregarded by the ALJ." (R. 10, PageID #: 786.) The Commissioner responds that the ALJ did limit Chiodo to the expressed limitations. (R. 13, PageID #: 814.)

A fuller examination of the record supports the Commissioner's assertion. The agency psychologists' Mental Residual Functional Capacity Assessment concerning claimant's individual adaptation limitations rates Chiodo as "moderately limited" in the ability to respond appropriately to changes in the work setting, and "not significantly limited" in the other specified abilities, i.e., to be aware of normal hazards, to travel to unfamiliar places or use public transportation, and to set realistic goals or make independent plans. The psychologists were asked to explain in narrative form Chiodo's adaptation limitations, and they responded:

> [Symptoms] would exacerbate in the face of perceived stressors yet she can adapt to a setting in which duties are routine and predictable. Changes should be well-explained and introduced slowly.

(R. 9, PageID #: 126,141.)

The ALJ's RFC incorporated this recommendation, as follows:

> . . . can perform simple tasks in a setting with routine and predictable changes that are explained and introduced slowly . . .

(*Id*. at 68.) As Chiodo concedes, this language "almost verbatim, adopted the state agency psychologists' opinions." (R. 10, PageID #: 786.) While Chiodo contends that the psychologists set forth "a specific functional limitation" concerning "perceived stressors" that was ignored by the ALJ, she does not identify the "specific functional limitation" in the record that she argues is missing from the RFC. (*See generally id.*)

Reviewing the parties' arguments and the evidence of record on this issue, the court finds the RFC concerning this matter is supported by substantial evidence.

### 3. Maintaining Concentration

Chiodo's final inconsistency contends that the ALJ's RFC does not provide for "any accommodations involving limitations in maintaining concentration." (R. 10, PageID #: 786.) Chiodo contends that the state agency psychologists stated that she would experience difficulties maintaining concentration. (*Id.*, quoting R. 9, PageID #: 126,141 ("concentration and pace are variable on a day-to-day basis").) But she contends that the ALJ's RFC does not provide for appropriate accommodations involving limitations in maintaining concentration. (R. 10, PageID #: 786.) She disputes an argument that "simple tasks" can account for problems in concentration, as an insufficient incorporation of a claimant's moderate deficiencies in concentration, persistence, or pace. (*Id.*, PageID #: 787, citing *Ealy v. Comm'r*, 594 F.3d 504, 517 (6th Cir. 2010), and other cases.) The Commissioner responds that the ALJ's limitation to simple tasks only was more restrictive than what the psychologists identified. (R. 13, PageID #: 812.)

The agency psychologists' Mental Residual Functional Capacity Assessment concerning claimant's sustained concentration and persistence limitations rates Chiodo as "not significantly limited" in the ability to carry out very short and simple instructions; in her ability to perform activities within a schedule, to maintain regular attendance and punctuality, and to sustain an ordinary routine without special supervision; and, in her ability to make simple work-related decisions. She was assessed as "moderately limited" in the ability to carry out detailed instructions; in her ability to maintain attention and concentration for extended periods; in her ability to work with others without being distracted by them; and, in her ability to complete a

normal workday and workweek without interruptions from her psychological symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.  (R. 9, PageID #: 125,140.)

The state agency psychologists explained the claimant's sustained concentration and persistence limitations as follows:

> The claimant can maintain attention, make simple decisions, and adequately adhere to a schedule.  She would need some flexibility in terms of time limits and production standards.

(*Id.*, at 125,140.)  They stated that "the evidence indicates that concentration and pace are variable on a day-to-day basis."  However, they indicated that, despite her restrictions, "she retains significant functional capacity."  (*Id.*, at 126,141.)

In *Ealy v. Comm'r*, which Chiodo relies upon, a state agency psychological consultant opined that the claimant retained the mental ability to understand and remember simple instructions; to sustain attention to complete simple repetitive tasks for two-hour segments during a workday, where speed was not critical; and to adapt to routine changes in a simple work setting.  *Ealy*, 594 F.3d at 509.  The court noted that the ALJ's hypothetical omitted the speed- and pace-based restrictions entirely, and should have included the restriction to two-hour segments, and that speed could not be critical to his job.  The court, therefore, determined that the claimant's limitations were not fully conveyed to the vocational expert.  *Id.*.a at 516.  *Ealy*, however, is more limited than Chiodo's brief represents; and it does not stand for the broader proposition that "the Sixth Circuit has refused to accept a limitation of 'simple' work as a sufficient incorporation of a claimant's moderate deficiencies in concentration, persistence, or pace."  (R. 10, PageID #: 787.)

In *Edwards v. Barnhart* as well, the focus was on the hypothetical question, which the court found did not adequately convey the claimant's concentration limitations to the vocational expert. The court expressed concern that the claimant in that case "may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job." *Edwards v. Barnhart*, 383 F.Supp.2d 920, 930 (E.D. Mich. 2005). In addition, the court noted that the particular jobs identified by the vocational expert seemed to "require a degree of sustained concentration, persistence and pace." *Edwards*, 383 F.Supp.2d at 931.

Chiodo does not challenge the hypothetical to the vocational expert. Rather, she disputes that the RFC adequately incorporated the functional limitations in maintaining concentration provided by the agency psychologists. (R. 10, PageID #: 786-787.) Although the psychologists assessed Chiodo as "moderately limited" in concentration and pace, they did not assign any specific functional limitations in maintaining concentration. They further stated that she "can maintain attention," that she "would need some flexibility in terms of time limits and production standards," but that, despite her restrictions, "she retains significant functional capacity." (R. 9, PageID #: 126,141.)

The court finds that the RFC reasonably incorporated these limitations, insofar as Chiodo is limited to light work where she "can perform simple tasks," and "can perform goal-oriented work but cannot work at a production rate pace." (*Id.,* at 68.) Reviewing the parties' arguments and the evidence of record on this issue, the court finds the RFC concerning this matter is supported by substantial evidence.


B. Mental Health Evidence: Consultative Examiner

Chiodo further asserts that the ALJ improperly evaluated the mental health evidence and

contends that the RFC is unsupported by substantial evidence, because the ALJ failed to incorporate all of the relevant limitations opined by the consultative examiner Halas. (R. 10, PageID #: 787-788.) Chiodo claims that, although the ALJ gave "great weight" to clinical psychologist Halas' opinion, "the ALJ failed to include or explain the omission of multiple material mental health limitations." (*Id.,* at 787.)

Chiodo argues that the RFC limits her to occasional interaction with coworkers and supervisors, which she contends does not comport with Halas' opinion. (R. 10, PageID #: 788, citing R. 9, PageID #: 68.) Chiodo points to Halas' opinion regarding her abilities and limitations responding appropriately to supervision and coworkers, which states:

> The claimant appears to have severe problems in this area. The claimant's psychological and emotional problems are likely to place significant limitations in her ability to interact with others and this includes peers, supervisors, etc.

(R. 9, PageID #: 694.)

Chiodo also notes that Halas stated that the claimant has "a low tolerance for any stress," and that her PTSD symptoms and symptoms of anxiety are likely to increase quickly under pressures of competitive employment. (R. 10, PageID #: 788.). She contends that the ALJ failed to address these issues, and "had a duty to explain why these limitations were disregarded." (*Id.*) Chiodo argues that the ALJ's decision must be based on the preponderance of the evidence, and asserts that material limitations from the consultative examiner were "either disregarded or drastically altered without any explanation." (*Id.*)

The Commissioner responds that Halas did not indicate whether the claimant's symptoms would preclude her from performing even substantial gainful activity with reduced mental demands. In addition, Halas did not delineate specific functional limitations. (R. 13, PageID #: 810.) The Commissioner states that "the ALJ not only limited the frequency of social contact to

occasional, but also significantly limited the nature of that interaction to speaking/signaling only." (*Id*. at 813.) Thus, the Commissioner asserts that the ALJ significantly limited the social demands of the work Chiodo could perform, limiting the frequency (occasional), complexity (speaking and signaling only), and audience (not the general public). The Commissioner argues these are significant limitations, because the ALJ limited Chiodo to only one of the eight types of interactions with other people described in the Selected Characteristics of Occupations in the Revised DOT. (*Id*. at 810.)

The Commissioner concedes that Halas indicated that Chiodo's stress symptoms would increase under the demands of competitive employment. But Halas did not indicate whether such increase would preclude work that involved reduced mental demands. The Commissioner argues that substantial evidence supports the ALJ's RFC finding. Halas rated Chiodo's functional abilities at 65 on the 100-point Global Assessment of Functioning scale. (R. 13, PageID #: 811.) Halas found that Chiodo had "significant psychological issues," yet he also determined that "[f]unctional severity is above this level and it is at 65." (R. 9, PageID #:693.)

The Commissioner points out that a functional ability score of 65 is near the midpoint of a range which describes a person who has "some difficulty in social, occupational, or school functioning . . . but [is] generally functioning pretty well [with] some meaningful interpersonal relationships." (R. 13, PageID #: 811, quoting American Psychiatric Ass'n, Diagnostic Manual for Mental Disorders 34 (4th ed. 2000).) The evidence in the record supports this assertion. Chiodo testified at the hearing she chaired a committee at her church, where she organized ushers, and dressed the acolytes (R. 9, PageID #: 92); she reported to Woodard that she participated in group social activities such as military reunions (*id*. at 720) and World War II re-enactments (*id*. at 561).

22

Reviewing the evidence as a whole, the court returns to the agency psychologists' determination that Chiodo's "social skills are generally intact," and that, while her condition imposes some restrictions, "she retains significant functional capacity." (R. 9, PageID #: 126, 141.) The psychologists did not find that she had a marked limitation in social functioning overall. (*Id.* at 122, 136 (moderate difficulty in social functioning).)

Viewing the evidence in the record cited by the ALJ, *Walker*, 884 F.2d at 245, there is substantial evidence of interpersonal interaction, which supports the ALJ's RFC finding.


## C.  Social Security Ruling 06-3p

Finally, Chiodo asserts that the ALJ's decision should be reversed because the ALJ violated Social Security Ruling (SSR) 06-3p. (R. 10, PageID #: 789-794.) Chiodo argues that the ALJ improperly discredited Woodard's findings and determined that her opinions were entitled to little weight, because he failed to evaluate her findings in accordance with the factors in 20 C.F.R. § 404.1527. (*Id.*, at PageID #: 789, citing R. 9, PageID #: 76.) Chiodo contends that, although nurse practitioners are not considered acceptable medical sources under SSR 06-3p, they are properly considered "other medical sources" that should be considered; and, in some circumstances, accorded greater weight than acceptable medical sources including treating physicians. (*Id.* at 789.) As such, Chiodo states that nurse practitioner's opinions are important and should be evaluated on key issues such as impairment severity and functional effects.

Although Social Security Rulings (SSRs) do not have the force of law, they are binding within the Social Security Administration, and SSRs represent agency precedent and statements of policy on which the courts rely in adjudicating cases. *Blakley*, 581 F.3d at 406 n.1 (citing 20 C.F.R. § 402.35(b)); *Quang Van Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989). Courts

defer to SSRs unless they are plainly erroneous or inconsistent with the Social Security Act or regulations. *Quang Van Han*, 882 F.2d at 1457. To the extent that any provision of an SSR conflicts with the applicable regulations, the regulations must control. *Clanton v. Comm'r*, No. 1:14CV1039, 2016 WL 74421, at *6 (W.D. Mich. Jan. 6, 2016) (citing *Paxton v. Secretary, HHS*, 856 F.2d 1352, 1356 (9th Cir. 1988)).

SSR 06-3p discusses the importance of the distinction between acceptable medical sources and other health care providers, as follows:

> The distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources" is necessary for three reasons. First, we need evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment. Second, only "acceptable medical sources" can give us medical opinions. Third, only "acceptable medical sources" can be considered treating sources whose medical opinions may be entitled to controlling weight.

SSR 06-3p, 2006 WL 2329939, at *2 (internal citations omitted).

The regulations define medical opinions as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). The regulations provide that acceptable medical sources are (1) licensed physicians (medical or osteopathic doctors); (2) licensed or certified psychologists; (3) licensed optometrists (for visual disorders only); (4) licensed podiatrists (for foot disorders only); and, (5) qualified speech-language pathologists (for speech or language impairments only). 20 C.F.R. § 404.1513(a); *see also* SSR 06-3p. A nurse practitioner is not identified as an acceptable medical source.

Chiodo contends that opinions from other medical sources, such as a nurse practitioner, should be evaluated by applying the factors in 20 C.F.R. § 404.1527(c). (R. 10, PageID #: 789.)

A plain reading of section 1527(c), however, indicates it is applicable to "how we weigh medical opinions" and, hence, the opinions of acceptable medical sources, which does not include nurse practitioners. The regulation provides that "we consider all of the following factors in deciding the weight we give to any medical opinion." 20 C.F.R. § 1527(c). As SSR 06-3p recognizes, "only 'acceptable medical sources' can give us medical opinions." SSR 06-3p, 2006 WL 2329939, at *2; see also 20 C.F.R. § 1527(a)(1). A nurse practitioner cannot give a medical opinion in this context.

Nevertheless, while information from other sources such as a nurse practitioner cannot establish the existence of an impairment, "the information may provide insight into the severity of the impairment," and how it affects the individual's ability to function. SSR 06-3p, 2006 WL 2329939, at *2; Cruse v. Comm'r, 502 F.3d 532, 541 (6th Cir. 2007); Reynolds v. Colvin, No. 1:12CV2994, 2013 WL 5316578, at *7 (N.D. Ohio Sept. 23, 2013). "Opinions from medical sources who are not acceptable medical sources" are addressed in Section 1527(f). Although Section 1527(f) recognizes that some of the relevant issues may be addressed using the same factors listed in paragraphs (c)(1) through (c)(6), the evaluation of an opinion from other medical sources "depends on the particular facts in each case." 20 C.F.R. § 1527(f)(1). Opinions from other sources who have seen the claimant in a professional capacity should be evaluated by considering how long the source has known the claimant, how consistent the source's opinion is with other evidence, and how well the source's opinion is explained. Cruse, 502 F.3d at 541. The regulation provides that the ALJ should explain the weight given to the other source's opinion. 20 C.F.R. § 1527(f)(2); Cruse, 502 F.3d at 541.

Chiodo recognizes that the ALJ provided an explanation for the weight he gave to nurse practitioner Woodard's opinion. (R. 10, PageID #: 790-791, citing R. 9, PageID #: 75-76.) But

she contends that the ALJ's analysis of Woodard's opinions "was insufficient and factually incorrect." (R. 10, PageID #: 791.) She points out that the ALJ reported that Woodard stated claimant had a "mild" limitation in maintaining concentration, persistence, and pace, when Woodard checked the box for a "moderate" functional limitation. (*Id.*, at PageID #: 791, citing R. 9, PageID #: 76 and 651.) Notwithstanding that factual error, the ALJ identified several examples of activities and work that claimant was able to perform, which demonstrated greater abilities than opined by Woodard. (R. 9, PageID #: 76.) The activities cited by the ALJ evidence greater functionality and abilities than either the "moderate" limitation set out by Woodard or the "mild" limitation attributed to her records.

Chiodo further alleges that Woodard stated Chiodo's mental health symptoms and chronic pain interfered with her ability to move, concentrate and focus. (R. 10, PageID #: 793, citing R. 9, PageID #: 651.) Woodard claimed that Chiodo was "seriously limited" in her ability to maintain attention for two hours at a time. (R. 9, PageID #: 651.) The ALJ addressed those claims by noting that, as more fully explained earlier in his decision, "the claimant is able to perform part time work, do extensive volunteer work, and make crafts and sell them at craft shows, which suggests greater abilities than opined by Ms. [Woodard]." (R. 9, PageID #: 76, *see also* PageID #: 69.)

There is substantial evidence in the record to support the ALJ's determination that Woodard's finding—for example, that Chiodo was seriously limited in her ability to maintain attention for two hours at a time—was not consistent with Chiodo's own reports to Woodard regarding her level of functioning. (R. 9, PageID #: 76.) The ALJ indicated, for example, that at a May 2014 appointment with Woodard, Chiodo reported that she had already made thirteen (13) stops running errands for her church that day. (*Id.*, at 69, 71, citing PageID #: 393.) Reference

to the record shows that Chiodo told Woodard that she had "been running around all day, I had 13 stops to make" running errands for her church. (*Id.*, at PageID #: 393.) At that same appointment, she reported that she "enjoys making crafts, caring for two pet dogs, playing bells at church, participation in church activities, spending time with family." (*Id.* at 394.)

Chiodo testified, during the hearing, that volunteering at the church "takes up most of my time." (R. 9, PageID #: 91.) She chairs a music and worship committee, which at the time of the hearing involved "a lot of [seasonal] decorating" at the church, purchasing decorations, as well as scheduling and organizing the ushers and acolytes, plus assisting them to prepare for the service. (*Id.* at 91-92.) She also testified that she volunteers as a member of the American Legion. She is a member of the Honor Guard, which represents at funerals, from twice a week to five times a month. (*Id.* at 93-94.) Contrary to Woodard's claim that Chiodo was "seriously limited" in her ability to maintain attention for two hours at a time, these activities, testified to during the hearing and relied upon by the ALJ in his determination, support the ALJ's conclusion that "considering the medical and psychological evidence and the medical and psychological opinions…claimant's subjective complaints and alleged limitations are not fully persuasive and…she retains the capacity to perform work activities with the limitations set forth above." (*Id.* at 76.)

Chiodo argues that, despite Woodard's being an "other source," her opinion should have been accorded "the greatest weight," in light of the longitudinal treatment relationship and the consistency of her opinion with other mental health opinions of record. (R. 10, PageID #: 791-794.) As required by SSR 06–03p, the ALJ considered the length of Chiodo's treatment with Woodard; the consistency of her opinion with the other medical evidence; and, "how well the source explains the opinion." (R. 9, PageID #: 75-76.) *See, e.g., Jones v. Colvin*, No.

5:14CV996, 2015 WL 1400680, at *15 (N.D. Ohio Mar. 26, 2015) (quoting *Cruse*, 502 F.3d at 541). As long as the ALJ addresses the other source's opinion and gives reasons for crediting or not crediting the opinion, the ALJ has complied with the regulations. *Hirko v. Colvin*, No. 1:15CV580, 2016 WL 4486852, at *3 (N.D. Ohio Aug. 26, 2016). Here, as set forth above, the ALJ supported his decision with numerous reasons for according little weight to Woodard's opinion. *Jones*, 2015 WL 1400680, at *15. The court finds that these reasons are supported by substantial evidence in the record.

Reviewing the parties' arguments and the evidence of record on this issue, the court finds the RFC is supported by substantial evidence. If substantial evidence supports the ALJ's finding, it must be affirmed, even if substantial evidence might support an opposite conclusion. *Bass*, 499 F.3d at 509; *Wright*, 321 F.3d at 614.

## RECOMMENDATION

For the foregoing reasons, the undersigned Magistrate Judge has determined that the decision of the Commissioner is supported by substantial evidence. Therefore, the undersigned recommends that the decision of the Commissioner be **AFFIRMED**.

s/ David A. Ruiz
David A. Ruiz
United States Magistrate Judge

Date:  April 19, 2017

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of mailing of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).